When Major League Baseball granted former Negro League players both medical benefits and a pension, it formally sought to make amends for the invidious discrimination it had practiced until 1947 by excluding African-American players. As I will discuss today, Mike Colbern and the class he represents are here today because Major League Baseball refuses to acknowledge that it is now engaging in an equally invidious form of reverse discrimination by denying similarly situated Caucasian players equal medical benefits and pensions. Additionally today I will also address that during their participation in Major League Baseball, plaintiffs received systematic injections of cortisone and other drugs in dangerous amounts. By intentionally withholding information but nevertheless encouraging these players to continue playing baseball, team doctors and trainers vitiated any consent to treatment and committed a battery. Title VII prohibits an employer from discriminating with respect to an individual's terms, conditions or privileges of employment on the basis of race or color. Disparate treatment, where an employer intentionally discriminates against an individual or class on the basis of a protected characteristic, violates Title VII. Here, defendants admit that Major League Baseball voluntarily provided former Negro League players medical benefits and a pension which were not accorded to plaintiffs or a Caucasian. These benefits are a privilege of employment which were conferred to the Negro League players. As I understand it, what Major League Baseball says is that these people were discriminated against. We're going to give them certain benefits. You weren't discriminated against. You received your normal treatment to collect the bargaining agreements. You were treated fairly. There's no problem with you. You were not in any way a victim of anything. You got fair treatment all along. And what does it have to do with it that people who were discriminated against are getting another benefit and maybe even a greater one? Your Honor, had the former Negro League players not been accorded certain pensions and medical benefits, then the Major League players in the class that Mike Colbrin and the class we represent would have been entirely what they … Suppose they had given each person who was forced to play in the Negro League instead of the Major League a million dollars. Would that adversely affect the Major League players who got pretty good salaries but not a million dollars? Your Honor, I think the situation is somewhat different. The reason why the Negro League players, the African Americans, and the Major League players in the class we represent are similarly situated is because of the requirements that are set forth in order for the African American players to receive their pensions and medical benefits. Part of the requirement was, for example, that the players either participated in the Negro League teams for one year and then participated in any part of three seasons in Major League or Negro League teams. Here, we have a similar situation in that there are … What benefit they give to the people in the Negro League because they were discriminated against? You said they have to give the same benefit to the white players in Major League baseball who were not discriminated against. Is that the theory? That is the theory, Your Honor. So if they just gave them a lump sum payment for the years of discrimination, they would have to give every white player an amount that would bring his salary up to that same amount? That would be our theory, Your Honor, because we feel that the benefits … Do you know of any case that has ever had a similar theory? This situation has not yet arisen. It probably is fairly unusual to give these kinds of benefits to people who have been discriminated against. It's not a bad idea. We don't dispute that, Your Honor. We just feel that our players … We give the same thing to the people who weren't discriminated against. We feel that the conferring of the benefits, such as the pensions, the medical benefits, are a term, a condition, or a privilege of employment, and that to confer that benefit upon the former Negro League players, they should have also done that for the Caucasian players. As the U.S. Supreme Court identified … Although it's not necessarily all Caucasian players who didn't receive that benefit. There also could be some African American players who actually played major league ball and didn't play in the Negro League who would be treated the same way. That is indeed the case, Your Honor. As we've set forth in the supporting declarations in opposition to the motion for sermon judgment, defendants made at least one medical benefit and pension payment to an African American former league Negro player who also played in the major league baseball. I think the question Judge Reinhart asked, though, is that aren't there class members … I don't know if they would be class members, but aren't there players in the major leagues who never played in the Negro Leagues who are African American, who are within the class period? There are. I believe that is the case. There may be one or two. I don't believe there are many. They wouldn't be victims of race discrimination in this sense, in the sense that you're saying. We are saying they wouldn't be victims of race discrimination because they had not been precluded from playing in major league baseball. However, we are saying that they are part of the class and that they are entitled to equal treatment. Not because of their race, but because of when they played baseball. Well, yes, Your Honor. I believe that … How can you say that the Caucasian players are similarly situated to the players from the Negro League if they were never precluded from playing in major league baseball? What we're arguing, Your Honor, is that they are now similarly situated because there are at least one African American former Negro League player who is now receiving pensions and medical benefits from the defendant who has now played on a major league roster. Okay. When do you determine whether or not the groups being compared are similarly situated? What's our guidepost for determining that? We are representing the class. The color barrier was so-called broken in 1947 when African American players were then permitted to play in the major leagues. We're saying that class extends up to 1979 when the laws regarding the provisions for pensions and medical benefits changed. My question to you is what case authority guides us in determining whether or not groups are similarly situated? I don't have a case at the top of my head, Your Honor, but you look for general similar characteristics to determine whether there is similarly situated classes. You look at  the health benefits and the pension benefits to see whether the treatment was equal or don't you look to their entire package of benefits. The salaries during that period in the Negro League, I'm sure, were lower than in major league baseball. If you're trying to equalize the treatment between the two leagues, wouldn't you have to take into account the fact that the people in major league baseball, who may not be getting as good health benefits or pension benefits, got much higher salaries? That's a very complicated issue, Your Honor, because in the Negro League they actually played substantially fewer games than did the players in major league baseball. And the players in the Negro Leagues were allowed to participate in other games outside of sanctioned Negro League play. While, by contrast, the major league baseball players were not entitled to play for any other team but the team that they were, the roster for whom they played. And so their salaries were actually limited by their payment from major league baseball while the Negro League players did not have such a limitation. So that would be very difficult to calculate. So it would be hard to tell whether this extra compensation in the form of benefits merely brings them up to the same level, even leaves them at a lesser level, or exceeds it? It would be difficult to calculate, Your Honor, yes, but that is to the extent that that were an issue of concern for the court. It could be resolved at trial. This case was dismissed merely on summary judgment, saying that the parties were not similarly situated. Whether the payment and whether the total compensation package should have also been addressed, that is something that could be resolved by further litigation. Do you want to talk about the battery claim? It's not so clear under California law when a doctor's false representations or misrepresentations that result in serious harm, whether that can be a battery or whether it's simply a negligence cause of action. Yes, Your Honor. Under Cobbs v. Grant, failure to obtain informed consent can be either negligence or battery. Well, yes. Is that your theory? Your theory is informed consent? It is based in imparting informed consent. But a battery does occur where a physician intentionally misleads his patient to obtain consent to a procedure. In short, excuse me, Your Honor, the fraud that is perpetrated by the physician would vitiate consent. Here, under the circumstances Let me ask you a question before you go further. If that's your theory, how does that translate to the cause of action against the Major League Baseball if the informed consent theory is limited to misrepresentations by a physician? Our theory, Your Honor, is that the team doctors and trainers were being encouraged by the leagues to keep players active in the sport. Yes, but how does that translate to a lack of informed consent? The lack of informed consent arises, Your Honor, because the players were unaware of the side effects of, for example, the cortisone and the other steroids. And had they been informed and had they known that their lives were being placed at risk, then they would not have... Do you have a conspiracy theory? We have not alleged a conspiracy theory whereby Major League Baseball goes into a back room with the trainers and the doctors. But, Your Honor, I believe as a matter of fact, that's what did indeed occur. What evidence did you adduce to support that theory? The evidence that we've relied upon on appeal is that Major League Baseball is running a business, in short. And what they're trying to do is make sure that that business continues to run by having players play. That is accomplished by some measure by giving steroid injections and cortisone injections to keep players out on the field. By doing so, players were more susceptible to injuries and... But, Counsel, you cannot make a global accusation if you're going to hold someone or an organization liable. There has to be some concrete evidence in the record to support those arguments. Did you point me to something concrete in the record that would support your argument that Major League Baseball was complicit in the battery? I cannot, Your Honor. Only to the extent that the teams are a part of Major League Baseball and are carrying out the activities of Major League Baseball. So to the doctors, what specific evidence in the record is there that the doctors misrepresented the effect of the cortisone injections to the extent that informed consent was vitiated? Your Honor, we've cited in the record that the trainers and the doctors did provide the injections to have the players continue to play ball and to avoid the players taking time off from the game. But that doesn't mean that there was a lack of informed consent. And we have also cited to evidence in the record, Your Honor, that the players were unaware of the risks of obtaining numerous cortisone shots. At the time, the trainers and the doctors knew that we're injecting the players with cortisone shots of three shots per week, sometimes up to 60 shots per year. And the maximum number of cortisone shots a player, any individual should ever obtain is perhaps 10 over the course of a lifetime. So the trainers clearly were aware of the over-prescription of the steroids that they were providing. Which member of the class had 60 cortisone shots, reported class, had 60 cortisone shots? I do not know off the top of my head, Your Honor. Is that in the record? I mean, is there an affidavit or a medical record or anything to support that? There are a host of affidavits in the record, many indicating that they received various injuries and the number of cortisone shots they had. Whether there is one affidavit specifically identifying that a player received 60 or more cortisone shots, I don't recall. I do know that it is set forth in the record. But this is a situation also where, just to conclude, that the team doctors and trainers knew that the risks were at hand, but chose to subject the players to the risk that they are. Are the doctors employees of the team? I believe they are, Your Honor. Counsel, is the set of limitations a problem for you? I don't believe it is, Your Honor, for the reasons that we've set forth in our brief. First, the players, as set forth in the affidavits, have testified that they were unaware that the players from the African-American leagues, or excuse me, the Negro leagues, were receiving pensions and medical benefits until August of 2003. Additionally, Your Honor, we do not we feel that this is a continuing violation and therefore not subject to statute of limitations. That the issue of statute of limitations was not raised below and that has not been addressed. All right. Are there any other questions I reserve the remaining time I have? Thank you, counsel. Thank you. Good morning. May it please the Court. My name is Howard Ganz. I'm here with Larry Rappaport from the Proscow Roads firm, attorneys for the Defendants' Affilies. The plaintiffs here did not receive medical or pension benefits under plans, excuse me, collectively bargained plans applicable to the employees of Major League Baseball clubs. They did not receive those benefits not because they are Caucasian, but because they did not qualify under the terms of those plans and collective bargaining agreements. There's no dispute that during the period during which plaintiffs were employed by Major League Baseball or MLB clubs, four years of MLB service was required in order to vest for these benefits, and there's no And that was a service requirement during the period that the plaintiffs focused on, 1947 to 1979, that applied to all employees, player employees of Major League Baseball clubs, Caucasian or African American. So yes, Judge Vogel, I certainly believe there are, and I can't give you the number, but my sports fan background suggests to me that there are a lot more than one or two African American players who never played in the Negro Leagues, that is, who joined Major League Baseball in the 50s or 60s, and lasted perhaps for something shy of four years, and so did not receive these benefits that are in dispute. So that is perfectly clear, it seems to me, on the record. The payments that were made and that are made to the former Negro League players are simply not tied to employment in Major League Baseball. They are payments that are made because these individuals played in the Negro Leagues, period. That is the sine qua non of the eligibility requirement. And in providing those payments, Major League Baseball, I respectfully submit, has not acted as an employer. These individuals were not employed by Major League Baseball when they played in the Negro Leagues. They have made these payments on a voluntary, quasi-charitable basis in order to provide at least some modest redress for a refusal to employ this group I'm not sure that it matters whether they were employees. Clearly they weren't. I suppose you could discriminate by making white players or white employees, persons, employees of a company, and treating blacks who did similar work as independent contractors, and not giving them benefits. I mean it would come up normally the opposite way. Yes, yes, it certainly does. Blacks would receive less. But I'm not sure that to compare the groups, they both have to be employees. Well, in order to state a claim I respectfully submit, under Title VII, you have to have employment discrimination. And there cannot be any discrimination in violation of Title VII unless there is an employment benefit. Suppose you said to the black people who came, we're going to make you employees, and you're going to get a salary for what you do, and it's going to be very low, and we're going to let white people do the same work, but we're not going to make them employees, we're going to give them commissions, and they're going to make twice as much as you do. That would probably be discrimination in violation of Title VII. I would agree. The label is not important, Your Honor. I don't mean to suggest that labeling an African-American an employee and a Caucasian an independent contractor entitles the service recipient of those individuals to discriminate. But we're not dealing with labels here. The Negro Leagues were an entity separate and apart from Major League Baseball. No legal relationship at all. No legal relationship whatsoever. These were not the minor leagues for Major League Baseball. This was a totally separate association. Well, in effect, Your Honor, you're compensating people for past discrimination. Certainly. Certainly. Certainly. And certainly in circumstances that under the cases that are not exactly analogous, but the affirmative action cases, these plans would fully meet all of the standards, the manifest imbalance, and there's certainly no unnecessarily trammeling on the rights of the majority, as Your Honor pointed out. Who's hurt here? I mean, the Negro Leaguers were certainly benefited. The plaintiffs here received all to which they were entitled as a matter of their employment by Major League Baseball. And to Judge Rowlands's point, there can't be any claim that these groups are similarly situated. The Negro League players were denied the opportunity ever to qualify for a Major League Baseball slash employee pension because they were excluded from Major League Baseball, those who had played in the Negro Leagues prior to 1948. These plaintiffs had every opportunity. They were not denied the opportunity. Indeed, they were advantaged, one could theorize, and I think with some degree of reasonableness, they were advantaged by the exclusion of African Americans. They probably, they may have played longer in the Major Leagues than they would have otherwise had there been greater competition. But that's not even the central point. The point is they had every opportunity to qualify, to render the service that would make them eligible for pensions. Their failure to receive those pensions has nothing to do with their race, only to do with either their decision no longer to play or the fact that the teams made the decision that they would no longer play. Yes. Yes, Your Honor. Yes. One other point that I think goes, in an effort to answer Judge Rawson's question as to when you make the comparison of similarly situated, I would 1947, or at least from the retrospective look, and I say that because I think it also demonstrates the absence of discrimination. At the very same time in 1997, that is, when Major League Baseball adopted this supplemental income plan for the former Negro League players. It adopted a supplemental income plan for players who had been in baseball, Major League Baseball prior to 1947. Why? Why was that done? Both of those groups never had an opportunity to qualify, to render the service eligible for a Major League pension. In one instance, in one instance, the pre-47 Caucasians, because there was no pension. And the other, the Negro Leaguers, because they were denied employment. But I think if there is any group that is close to similarly situated here, it is the pre-47 Caucasian players who get the identical benefit that is provided to the former Negro Leaguers. So I think there can be no question that the district court properly dismissed the Title VII claim. Just quickly on the statute of limitations with respect to the Title VII claim, this is clearly, I believe, an instance where the cases which describe the decisions that have their inevitable consequences. It's when the decision is made. Here, with finality, in 1997, there was a decision made to provide supplemental income benefits to players who potential beneficiaries of this program. If there was a discriminatory act, and we certainly dispute that, it only happened then, in 1997. To complete the thought, it was a final decision to provide those benefits and not to provide similar benefits to people who were in Major League Baseball? No. You didn't decide not to provide the benefits? Well, actually, at the same time, the benefits were provided to a group of Caucasians who had played baseball before 1947. But that applies to this class. There was a final decision made at the time. Yes, certainly. I mean, they were, yes. I'm sorry. I missed the import of your question. But certainly, certainly. That's when this class knew they were not going to get the burden of the court with the reasons why we believe they should have known. I think that's pretty well set forth in our briefs. Just very quickly on the battery, California law may be unclear, but I don't believe it's unclear that where there is consent to a touching, that's not a battery. If it's informed consent. No, no, no. Where there's consent, consent can be vitiated, but by fraud and misrepresentation. That's what I'm going to ask you, counsel. Is that where you're going, that if there is a tort, other than negligence, to be had here, it has to be something on the order of fraud? Yes, yes. You've got to know that you're giving somebody something dangerous and not tell them. And there is no showing of any affirmative misleading here. Indeed, there are, I think there are something like 419 declarations that were submitted to the district court in support or in opposition to the motion. In only eight of those is there, are there assertions that the player, the former player, was injected or was administered cortisone shots or other drugs. Not one of those eight players, not one of those declarants says I was misled. Just says I wasn't informed. And that's not. And you know that, and one thing that I couldn't get from the record here is what the state of knowledge about steroids was at the time that these events occurred. But putting that aside for a second, if you assume that a doctor knows that giving somebody three-quarters on shots a week is very seriously harmful to health and completely contrary to standard medical practice, and they don't tell the patient that, that all you can do is proceed for negligence? Yes. And what about, and it's not pled here, but what about fraudulent concealment? At some point does it amount to a, to a misrepresentation if something is so well established and so material and you don't tell somebody? Is there potentially a fraudulent concealment theory here? I guess my candid answer is I don't know. But there's certainly nothing in the record that would ever permit those, that convention to be made. Yeah. Excuse me. I just have one more question, just to follow up. Did the district court, and forgive me for not knowing this, but did the district court ever have occasion to deal with the fact, or with the question rather, of whether these claims could even be brought as a class action or whether they were uniquely individual? That never came up. That was not an issue for the district court at all. Also, on the question of whether you can have a battery as a result of the consent being vitiated, the motive of the doctor is also relevant. Yes. And if the doctor is prescribing these medical, this medical treatment, knowing it's harmful to the, to the player, but is doing it for the benefit of his employer, baseball, that might be under California law, a battery. I think the cases are more restrictive than that, Judge, at least the ones that have been cited against us. The only two circumstances that the courts in California seem to acknowledge as vitiating the consent in a fashion sufficient to permit a battery claim are one where the doctor says he's going to operate on the shoulder, but then operates on the knee when a treatment different from that to which the patient has consented is administered. And where there are these exaggerated self-interest motives on the part of the physicians. And there was one case where they, I think the expression is sluggo therapy was used by some psychiatrists didn't sound like a very interesting treatment, but, but it was an extreme case in which I think we'd all agree that was an appropriate basis for battery claim. Thank you, Your Honor. Just a few quick points, Your Honor. I just want to make clear that in terms of this similarly situated analysis, we have at least one former Negro League player who played in Major League Baseball for less than the vesting period and yet received medical benefits and a pension. If also just want to make clear that medical benefits, pensions are part of employment, privileges of employment, and therefore have to be accorded equally as per Title VII. And as the California, or excuse me, the United States Supreme Court case, Ishan B. King has identified a benefit that is in part and parcel, that is part and parcel of an employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under employment contracts, simply not to provide the benefit to all. Here, Major League Baseball's decision to include that benefit for former Negro League players compels that they do so here for our class. How do you view your battery claim? What's the theory? And what did you show in the affidavit? The affidavits show that the players were given numerous injections of cortisone and other steroids, that after extensive use of these steroids, they suffered extensive injuries, and that they were not notified as to the effects of the steroids, nor were they notified why the physicians were giving the steroids to the individuals as a means of keeping them in the game. Are there allegations that the doctors were aware of the harmful effects of these? Yes, there are definitely allegations that the physicians were aware of the detrimental nature of the steroids. My understanding is knowledge of the dangers of steroids actually occurred far before this class was enacted. Where is that in the record, that the doctors were aware of the danger of cortisone use? We've cited to the record in our brief where the doctors... What was the nature of the proof? Is it in the affidavits of the players? I don't believe it's in the affidavits. I know for... Where is it? It would be in part in... To be honest, Your Honor, I do not recall. I remember that we've cited to the record to support our allegations that the physicians were aware of the detrimental nature of the cortisone. With some particularity? With particularity. All right. Thank you, Jim. Unless you have any other questions, Your Honor, submit them. Thank you very much, counsel. Thank you.
judges: Reinhardt, Rawlinson, Fogel